☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.22-970M(NJ) |
| information associated with the Facebook user ID | ) |
| 100029507075929 that is stored at premises owned, | ) **Matter No.: 2022R00249** |
| maintained, controlled, or operated by Meta Platforms, Inc., | ) |
| (fully described in Attachment A) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before  September   6, 2022_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____.
                                                                                            *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:8/23/2022 @ 11:51 a.m._____

*Judge's signature*

City and state:   Milwaukee, WI_____          Hon. Nancy Joseph, U.S. Magistrate Judge
                                                                              *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID **100029507075929** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including the full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers for user Account Name: "**LilBill OffGalena**" with the Username: **lilbill.offgalena.71**, and **Account ID: 100029507075929**.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **March 1, 2022 to June 1, 2022**;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

25

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f) All other records and contents of communications and messages made or received by the user from **March 1, 2022 to June 1, 2022**;**,** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g) All "check ins" and other location information;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account from **March 1, 2022 to June 1, 2022**;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service used by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

26

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 10 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2119(1) (carjacking), 18 U.S.C. § 924(c) (possessing and/or brandishing a firearm during a crime of violence), and 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm) involving VINCENT JACKSON, including, for each user ID identified on Attachment A, information pertaining to the following matters:

> (a) The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between VINCENT JACKSON and others related to the relevant offense conduct of illegal use and possession of firearms and carjacking;
>
> (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;
>
> (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;
>
> (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and
>
> (e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the sale of firearms and sale and use of controlled substances, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in

addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>information associated with the Facebook user ID 100029507075929<br>that is stored at premises owned, maintained, controlled, or operated<br>by Meta Platforms, Inc., (fully described in Attachment A) | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 22-970M(NJ)

**Matter No.: 2022R00249**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | Hobbs Act Robbery |
| 18 U.S.C. § 924(c) | Brandishing a Firearm During the Commission of a Crime of Violence. |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Heather N. Wright, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 8/23/2022

*Judge's signature*

City and state: _Milwaukee, WI._

Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEACH WARRANT**

I, Heather N. Wright, being first duly sworn on oath, hereby depose and state as follows:

**INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since July of 2010. Since August of 2020, I have been assigned to the FBI's Milwaukee Area Violent Crimes Task Force, a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including bank robberies, commercial robberies, armed motor vehicle robberies, and other violent crime matters, defined under Title 18 of the United States Code. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

3.	Based on my training and experience, I know that criminal investigations have been aided by subpoenas, warrants, and court orders related to electronic communication records by providing critical investigative leads and corroborative evidence.

4.	The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.	Based on the investigation to date and the facts as set forth in this affidavit, I submit that there is probable cause to believe that on or about March 13, 2022, on or about April 21, 2022, on or about April 22, 2022, on or about May 3, 2022, on or about May 11, 2022, on or about May 18, 2022, and on or about May 20, 2022, VINCENT M. JACKSON (dob: 06/24/2000) committed violations of Title 18, United States Code, Section 1951 (Hobbs Act Robbery), Title 18, United States Code, Section 924(c) (brandishing a firearm during a crime of violence), and of Title 18, united States Code, Section 2119 (carjacking). I further submit that there is probable cause to believe that evidence of JACKSON's and others' involvement in the robberies will be recovered in the records described in Attachment A and described in Attachment B.

**PROBABLE CAUSE**

6.	On March 13, 2022 at approximately 8:53 p.m., Milwaukee Police Department Officers were dispatched to an armed robbery complaint at the location of 4244 N Teutonia Ave, Milwaukee, Wisconsin. Upon arrival, Officers spoke to the victim, hereinafter Victim 1, who stated that she received a text earlier in the day from a friend she has known for two (2) years whom she knows as "BILL". Victim 1 stated that she also knew BILL by his Facebook page as

"LILBILL OFF GALENA". Officers were able to identify the person in the Facebook page that as Vincent M JACKSON (M/B 06-24-2000.

7.      Victim 1 stated that on March 13, 2022, BILL had invited Victim 1 to the address of 4244 N Teutonia Avenue, Milwaukee, to hang out. Victim 1 stated that BILL let her into the locked apartment complex at approximately 8:40 PM, and walked her to the rear of the complex via the first floor common hallway. At the end of the hallway, BILL walked past a doorway and began to walk up the stairs to go to the second floor. A Victim 1 walked past the doorway, an unknown male, hiding behind behind the door grabbed her and pulled her behind the door. Victim 1 described the unknown male as a black, male, approximately 6'1", heavier build, wearing a red hooded sweatshirt with the hood pulled up. The subject pressed a black semi-auto handgun against her chest. Victim 1 stated that the subject told her that the firearm was a "Glock." Victim 1 stated that she heard people in the common hallway, and peeked around the door to scream for help but the suspect that was holding the firearm quickly closed the door so they could not see them. Victim 1 stated that she became extremely scared and feared for her safety.

8.      Victim 1 stated that while at gunpoint, the unknown suspect led her to the basement of the complex. Victim 1 observed BILL following behind the unknown suspect. While at the bottom of the stairs, the unknown suspect pressed the firearm against the right side of her head and demanded her red iPhone SE with a pink case valued at $500. Victim 1 stated that BILL and the unknown suspect then took her into a dark room in the basement of the complex, and the unknown suspect then told her to stay there until they left the building. Victim 1 stated that BILL and the unknown suspect then fled from the basement on foot in an unknown direction. Victim 1 stated that she remained in the basement for approximately five minutes before she thought it was safe

3

enough for her to leave. Victim 1 then fled to her vehicle and called police with a second phone she had in her car.

9.  After Victim 1 called for police assistance, Victim 1's sister arrived on scene and Victim 1 was able to track her iPhone using her sister's phone in order to obtain her phones location. The cellular phone was located on the ground, in a puddle, at 4310 North 22nd Street, Milwaukee. Victim 1 provided law enforcement with "BILL's" phone number once it was recovered. Victim 1 provided the number as 414-249-6832. An open source search of the phone number revealed that the number was associated to TextNow, Inc., an end-to-end phone service contained inside an app which provides free texts and calls over Wifi.

10.  On May 10, 2022, a state warrant was applied for and granted by the Honorable Milwaukee County Circuit Court Judge J.D. Watts for the subscriber information of the 414-249-6832 number and on May 10, 2022, TextNow, Inc., provided the requested information. TextNow disclosed that the number 414-249-6832 was associated to the User Name: lk289317, Email: lj289317@gmail.com. This user had logged in on March 13, 2022 at 12:16:04 UTC using a registration IP of 184.59.2.199. This was the time that the user sent the address of 4244 North Teuntonia Avenue where the crime was committed. An open-source search for the assigned provider of IP address 184.59.2.199 revealed that the IP was assigned to Charter Communications, Inc. and on May 24, 2022, a state search warrant was applied for and obtained for the subscriber information to Charter Communications related to this IP address.

11.  On August 13, 2022, a follow-up interview was conducted of Victim 1. Victim 1 stated that although she had originally told police that she had arrived at 4244 N. Teutonia Avenue to hang out with BILL, she had actually arrived at the address in response to a prostitution request. Victim 1 stated that when she arrived at the address and was subsequently robbed by BILL, she

4

immediately recognized BILL as the person she knew on Facebook. Although Victim 1 had recognized BILL, Victim 1 did not believe that BILL had recognized Victim 1 druing the robbery. During this subsequent interview, MPD Detectives conducted a photo array of JACKSON with Victim 1. Victim 1, immediately and without hesitation, was able to identify JACKSON as the individual that robbed her on March 13, 2022.

12.     On April 21, 2022, at approximately 10:35 a.m., a second victim, hereinafter Victim 2, stated that she went to the address of 4244 North Teutonia Avenue to buy some marijuana. Victim 2 stated that she was given the subject's contact information from a friend on Facebook. Victim 2 stated that when she arrived at 4244 North Teutonia Avenue, she entered the apartment lobby and met a black male, approximately 23 years old, 5'8". 140 pounds, slim build, light complexion, with dreadlocks to his shoulders, wearing a black face covering, black hoodie and black jeans, hereinafter Subject 1. Victim 2 and Subject 1 took the stairs to the second floor of the apartment building and walked to apartment number 21. Victim 2 stated that when they entered the apartment, she noticed that it was vacant. Victim 2 asked if anyone else was there. Victim 2 then observed a black male, approximately 22 years old, 5'5", 130 pounds, slim build, dark complexion, wearing a black face covering, black hoodie, and armed with a black handgun, hereinafter Subject 2, and a black female, approximately 20 years old, 5'4", 100 pounds, slim build, light complexion, and wearing a camel hoodie and jeans, hereinafter Subject 3, enter the room. Victim 2 stated that Subject 2 pointed the handgun at Victim 2 and demanded her property. Subject 3 removed $30, her black iPhone XR in a pink case with glitter, and a can of pepper spray from her front pocket. Victim 2 stated that all three Subjects then fled the apartment in an unknown direction.

5

13.     On April 22, 2022, at approximately 10:55 a.m., a third victim, hereinafter Victim 3, stated that she arrived at 4244 North Teutonia Avenue for a prostitution date that had been set up in response to an ad that had been posted on Megapersonals.eu, and was robbed of her property and her vehicle. Victim 3 stated that her sister, T.H., had posted an escort ad for her the morning of April 22, 2022, on Megapersonals.eu under the name "Amore". Victim 3 stated that she used a TextNow number in order to communicate with prospective customers. Victim 3 stated that she was contacted by an individual that inquired if she was available. Victim 3 negotiated a price of $100 for 15 minutes of sexual intercourse. The Subject  provided an address of 4244 North Teutonia Avenue.

14.     Victim 3 stated that after she got ready, she made her way to 4244 North Teutonia Avenue, she parked her vehicle in front of the apartment complex, left her purse in the car, and let the subject know that she had arrived. The subject told Victim 3 to enter the apartment and go to apartment 21. Victim 3 went to the second floor, went to apartment 21, and knocked on the door. A black male, approximately 24-25 years old, 5'10", 150 pounds, slender build, light complexion, short "twisties" wearing a black ski mask with a single face hole, a black hooded pull over sweatshirt and black sweatpants with holes, hereinafter Subject 4, answered the door. Victim 3 stated that she thought it was odd that Subject 4 was wearing a ski mask. Victim 3 stated that she walked approximately four steps into the apartment when she realized that the apartment was empty. Victim 3 asked Subject 4 why he was wearing a mask, who's apartment it was, and where all the furniture was. Victim 3 stated as soon as she realized something was off, a second black male, with a dark complexion, armed with a black handgun, hereinafter Subject 5, came from behind her and pressed the gun against the middle of her back. Victim 3 believed that Subject 5 had been in the apartment as she did not hear anyone walking down the hallway or behind her.

6

Victim 3 stated that Subject 4 was walking back towards the northeast bedroom and Subject 5 had the gun to her back and was guiding her there. Once they got to the bedroom, Subject 5 directed her to go to the west wall and put her hands up against it. Subject 5 told Victim 3 not to turn around or he would shoot her. Victim 3 was extremely scared, told the subjects that she would anything they wanted, and begged them not to kill her. Subject 5 instructed Victim 3 to take off her shoes. Victim 3 took her shoes off and put them to the side. Victim 3 had her car keys in her hand and when Subject 5 grabbed the keys from her hand, she was able to see his dark complexion. Subject 5 was the one giving all the verbal commands. Subject 5 then told Victim 3 to remove all of her clothing and said that they were not going to touch her. Victim 3 complied and placed all her clothes in a pile. After getting completely naked, she was instructed to stand in the closet in the northwest corner of the bedroom. Subject 5 told Victim 3 to not leave until she heard the doors to the apartment close. Victim 3 stated that as soon as she heard the doors close, she turned around and the only clothes they left were her pants. Victim 3 put on her pants and knocked on neighboring apartments until she found someone who answered. An older male provided Victim 3 with a black T-shirt. Victim 3 then ran downstairs and saw that her car was gone. Victim 3 then observed a property manager walking the grounds. Victim 3 approached him, told him what had happened, and requested he call 911 for her.

15.     The Milwaukee Police responded shortly thereafter. Victim 3 told police that the suspects took her clothes (including $1000 pink Balenciaga sneakers), her car keys and car she was using, a navy 2009 Volkswagen Jetta, along with a red iPhone 13, a Louis Vuitton purse which was in the car with her license, debit cards and approximately $50.

16.     While on scene, T.H. arrived in order to provide clothing to Victim 3. T.H. told Detectives that she may be able to provide some insight into the identity of one of the subjects.

T.H. provided a Facebook profile of an individual with the Facebook profile name "Lil Bill". T.H. stated that she believed that this person may have been the individual that robbed her sister. T.H. stated that a month prior, the individual had come over to her house to meet with her roommate. T.H. stated that she left the room to give them some privacy and a few minutes later, her roommate told her that he had robbed her. Victim 3 viewed the profile and indicated that the person associated with the Facebook account had the same complexion as Subject 5. The Facebook profile information associated to the account was www.Facebook.com/lilbill.offgalena.71. This account appears to be the same profile as the profile provided by Victim 1 following the robbery that occurred on March 13, 2022.

17.     On May 3, 2022 at approximately 7:51 PM, a fourth victim, hereinafter Victim 4, walked in the District 5 Milwaukee Police Department Police Station and stated that approximately one month prior, she had met a black male on Facebook that went by the profile name "Maxx Cane". It was later determined that the profile name "Maxx Cane" was the profile name for the subject's TikTok account. Victim 4 stated that on May 2, 2022, "Maxx Cane", whom Victim 4 later identified as JACKSON, spent the night at her residence. On May 3, 2022, Victim 4 told JACKSON that she wanted to sell her blue iPhone 12 Promax, which is worth $800. JACKSON told Victim 4 that he may know someone who could buy her phone.

18.     Later that day, JACKSON picked her up in his gold Infiniti sedan with tinted windows with an unknown subject, hereinafter Subject 6, in the rear passenger seat of the vehicle and drove to the north side of Milwaukee. Victim 4 described Subject 6 as a light complected black, male, approximately 18 years old, with longer curly hair pulled back into a ponytail wearing a knit winter hat and a black face covering that overed his mouth area. Victim 4 stated that JACKSON parked the vehicle and approached a dark colored SUV Infiniti. Victim 4 stated that

8

JACKSON had a brief conversation with the driver of the vehicle before getting back into his vehicle. Victim 4 stated that she could not see the driver of the SUV. Victim 4 stated that something didn't feel right, and she started to worry about her safety. Victim 4 stated that Subject 6 in the rear seat along with JACKSON stopping and speaking to the subject in the SUV concerned her. Victim 4 stated that she was so concerned that she sent a text to a friend advising her that if she didn't hear from her in 30 minutes that she was with "Maxx Cane".

19.     Victim 4 stated that JACKSON re-entered his vehicle and he drove her to the address of 3921 N Humboldt Blvd, Milwaukee, WI. Victim 4 stated that they parked in front of 3921 N Humboldt Blvd facing south and JACKSON asked for Victim 4's phone. Victim 4 provided the phone to JACKSON, JACKSON exited the vehicle and walked to the rear of the address while Subject 6 remained in the vehicle with her. Victim 4 stated that within one minute, Subject 6 received a phone call from JACKSON asking what the passcode was for Victim 4's phone.  Subject 6 tapped on her shoulder and stated that JACKSON wanted to know the passcode to her cellphone. Victim 4 stated that she provided him with her passcode and the phone call ended. Victim 4 stated that another minute or so went by, and Subject 6 received another call from JACKSON. This time Subject 6 person advised Victim 4 that JACKSON wanted her to meet him in the rear of the building. Victim 4 stated that she exited the vehicle and walked around to the back of building.

20.     Victim 4 stated that once she made her way to the rear of the building, she observed JACKSON standing with his left hand in his left pocket of his sweatpants. Victim 4 stated that JACKSON was talking with someone on his cellphone. Victim 4 stated that as she was standing there, she observed a magazine from a firearm sticking out of the left pocket of his sweatpants and realized that JACKSON was armed with a firearm. Victim 4 suspected that when JACKSON

9

stopped to speak with the subject in the dark SUV, he must have obtained the firearm because she had not noticed it until they were in the rear of the complex. Victim 4 stated that JACKSON looked at her and told her, "You need to stay here now." Victim 4 stated that she was confused and asked him "What do you mean?". Victim 4 stated that JACKSON replied, "I'm telling you, you have to stay here and wait." Victim 4 stated that she knew she couldn't do anything to JACKSON because he was armed and she feared for her safety. Victim 4 stated that she asked JACKSON, What's going on?" and JACKSON replied, "wait here a second". JACKSON then fled on foot with her cellphone. Victim 4 stated that JACKSON fled south and then east back towards his vehicle. Victim 4 stated that she waited several minutes before walking towards the front of the complex only to discover that JACKSON and the vehicle were gone. Victim 4 was presented with a photo array including the suspect JACKSON. Victim 4 positively identified JACKSON as the individual that robbed her of her cellular telephone.

21.     On May 11, 2022, at approximately 11:20 a.m., officers responded to 4295 North Teutonia Avenue regarding an armed robbery. The victim, hereinafter, Victim 5, indicated that at approximately 7:00-8:00AM, she posted an escort ad on the website megapersonals.eu under the telephone numer 708-271-3621 under the name "Tia". At approximately 9:00AM or 10:00AM, she received a telephone call from a subject using the telephone number 414-786-0323 and he asked if she was available. Victim 4 and the subject agreed upon 3.5 grams of marijuana and $100 in exchange for a half hour of sexual intercourse. The subject then texted Victim 4 the address of 4244 N Teutonia Avenue. The Victim 5 stated that she got ready and arrived at 4244 North Teutonia at approximately 11:15AM.

22.     Victim 5 stated that she parked in front of the building and contacted the suspect to let him know that she had arrived. The black, male, approximately 18-25 years old, 5'6" to 5'7",

slender build, 130-150 pounds, wearing a red track suit with a red hood, white zipper, red sleeves, white sides, red pants, a blue surgical mask, small "beady eyes", short to no eyelashes, and "craters" or acne scars on his forehead, hereinafter Subject 7, came out and got into her vehicle. When Subject 7 entered the vehicle, he told her that the area was "hot around here" and told her to pull around to the back of the building. Victim 5 stated that while she was looking for a place to park, the suspect pulled out a silver over black handgun and said "where the money at?" Victim 5 told Subject 7 that she did not have any money. Subject 7 then grabbed her iPhone from her hand and demanded to know the passcode to the phone. Victim 5 provided the passcode to the phone. Subject 7 then grabbed her black leather fanny pack that contained $250, exited the vehicle and fled northbound in the alley. Victim 5 then drove to the gas station located at 4295 North Teutonia and called the police to report the incident. Law enforcement was able to locate the escort ad associated to Victim 5 under the name "Tia" with post ID number 26804511 with the title Sexy Thick Ebony Porn Star.

23.     On May 18, 2022, at approximately 9:40 a.m., officers responded to an armed robbery near the address of 4244 North Teuntonia Avenue, Milwaukee, Wisconsin. Upon arrival, officers spoke with the victim, hereinafter Victim 6. Victim 6 stated that on May 18, 2022, at approximately 7:50 a.m., she posted an escort ad on the website magapersonals.eu with the telephone number 414-573-6022 under the name "Jazzy Kash" and said that the ad was titled "Young sexy fun" or something similar.

24.     Victim 6 stated that at approximately 7:00 a.m., Victim 6 received a text asking if she was available. After Victim 6 negotiated a price of $120 for her services, the subject texted back an address of 4244 North Teutonia Avenue, Milwaukee, Wisconsin. Victim 6 sent a text to the subject when she was ready to leave and told the subject to call her. Victim 6 stated that the

subject did call, however, she could not understand whoever called because there was too much noise in the background and the person wasn't really talking. Victim 6 hung up the phone and called, however, no one answered. By this time, Victim 6 was three minutes from the location so she continued to the address. When Victim 6 pulled up, she texted the subject that she had arrived. Victim 6 received a text back instructing her to go into the front door of the apartment and go to apartment 6. Victim 6 stated that after she entered the apartment, she passed a black, male with dark brown skin complexion, approximately 17-23 years old, 5'4", slender build, wearing a black balaclava style mask, a black hooded sweatshirt, black skinny jeans with black diamond or rhinestones down the sides in a stripe, sitting on the stairs leading up to the second floor, hereinafter Subject 8.

25.    Victim 6 stated that she walked to the back of the apartment building and located apartment 6 which was located near the back entrance of the apartment building. Victim 6 stated that she attempted to enter the apartment, but the door was locked so she knocked on the door. As she was knocking, she observed Subject 8 approach her with a black semi-automatic handgun, with a green laser on it, and pointed the gun to her head. Subject 8 grabbed her by the lapels and began pushing her. It was then that Subject 9, described as a black, male, brown skin complexion, approximately 17-23 years old, 5'3" heavy build, wearing a black balaclava mask, black hooded sweatshirt, and black pants, and Subject 10 described as a black, male, black balaclava mask, black hooded sweatshirt, and black pants appeared from behind her. Subject 8 began yelling at her "give me everything you got!" Victim 6 stated that all three subjects were pushing her in all different directions and Victim 6 heard one of the suspects say to "take her to the basement." It was then that Victim 6 stated that she began to fight for her life because she was unsure of what would happen if they took her to the basement. Victim 6 stated that she became "dead weight" and began

12

attempting to crawl to the back door. Victim 6 stated that once she got to the back door, the suspects finally let her go.

26.     The subjects were able to obtain Victim 6's Apple iPhone with pink Otterbox case. Once Victim 6 was able to leave, she ran around the south side of the building to the front and entered her car. She began to beep the horn on her vehicle until she was able to borrow someone's phone in order for her to call the police. Victim 6 spoke with a female resident of the complex. The woman told Victim 6 that Victim 6 was the second or third woman that these same subjects had done this to and that the subjects lived in the apartment complex.

27.     On Friday, May 20, 2022, at approximately 8:35AM, officers were dispatched to an Armed Robbery located at 801 E Capitol Dr, Milwaukee, Wisconsin. Upon arrival, officers were met by the victim, hereinafter Victim 7. Victim 7 stated that at approximately 8:02 a.m., she ordered an Uber ride and she was scheduled to be picked up in front of her address which is located at 712 W Melvina St. Victim 7 stated at approximately 8:15 a.m., a gold four door Infiniti (possibly a g35), with a black bumper, pulled up and the driver of the vehicle, a black, male, early 20's, skinny, hair on the top and tapered around the sides, hereinafter Subject 11, stated "you Hennessy right?". Victim 7 stated her Uber account name is "Hennessy" so she figured this vehicle was her Uber. Victim 7 stated that she was initially about to get in the backseat but there was a lot of items back there, so she instead got into the front passenger seat. Victim 7 stated she was supposed to be dropped off at the Restaurant (Coffee Makes You Black) located at 2803 N Teutonia Avenue, but Subject 11began to take a unknown route. Victim 7 stated she had was looking at her phone, so she did not know exactly which way Subject 11 took her. Victim 7 stated that Subject 11 pulled into the rear of 3885 N Humboldt Blvd, behind multiple apartment buildings. Victim 7 stated that Subject 11 stated "I dont wana hurt nobody, but you gotta face the window". Victim 7 stated that

when she looked to the right towards the window she heard a "clacking" noise. Victim 7 stated

that the noise sounded like a gun hitting against something. Victim 7 stated that Subject 11 then

told her to give him her phone and to unlock it.  Victim 7 stated she turned slightly to the left and

saw a black handgun pointed at her. Victim 7 stated that Subject 11 told her again to face the

window and to give him her purse. Victim 7 stated that she feared for her safety, so she complied

the Subject 11's demands. Victim 7 stated that her small cross body purse contained, a Paypal card,

ID card, multitool, airpods, and US currency. Victim 7 stated that she then got out of the vehicle,

ran westbound towards the bushes and the Subject 11 then fled southbound towards Capitol Dr.

Victim 7 stated that she ran to 801 E. Capitol Dr and used a stranger's phone to call the police.

28.      Later that day, Victim 7 called the Milwaukee Police Department to inform officers

that the airpods that were stolen during the robbery, had tracking capabilities on them.  Victim 7

stated that the airpods were alerting to 6272 N 101st Street, Milwaukee.  Squad 4244 (PO Bradley

BAKER and PO Collin ENK) responded to the location.  While arriving at the location, Squad

4244 observed the Gold Infiniti, described by Victim 7, parked in the parking lot of 6272 N 101st

Street. A black male, later identified as JACKSON, was observed exiting the location of 6727

North 101st Street, Milwaukee. PO Bradley and PO Enk observed JACKSON enter the Infiniti

G35. The vehicle then began to travel away from the residence.  Due to the vehicle having no

registration and believed to be used in a robbery, Squad 4244 conducted at traffic stop at

approximately 10025 W Bender Avenue.  The vehicle stopped and the driver, JACKSON, fled the

scene on foot.  Squad 4244 was able to apprehend JACKSON and place him into custody.  A

search incident to arrest of the vehicle revealed paperwork for Jermesha FARMER and the address

6282 N 101st #206, Milwaukee, WI.  Officers entered 6272 N 101st St and observed that the

mailbox associated with apartment number 206 had a label that stated FARMER/JACKSON. It

14

was determined that JACKSON resided at apartment 206 with his girlfriend, identified as JERMESHA FARMER (dob: XX/XX/2001). Officers contacted Victim 7 again and Victim 7 stated that the location for her airpods were showing inside of an apartment complex on the southeast corner of 101st Street amd West Bender Avenue which was 6272 North 101st Street.

29. During the investigation, FARMER arrived at the location and confirmed that JACKSON had access and keys to apartment #206, that he spends the night at the location regularly, and that they have two children in common. FARMER also identified the gold Infiniti as belonging to JACKSON. FARMER provided a key to the apartment for officers to use once a search warrant was obtained.

30. On May 20, 2022, a state search warrant was authorized for the search of 6272 North 101st Street #206 and executed. During the search of the apartment, law enforcement located three firearms, a loaded grey and black Taurus 9MM pistol bearing serial number TLP32044 and magazine, a loaded black Glock 19, Generation 4, 9MM pistol bearing serial number VKR722 with a FDE colored magazine, and a loaded black Kel -Tec, C33, .22 caliber semi-automatic pistol bearing serial number M8532 with a clear  magazine, with a red laser, shoe lace sling. The following additional items were also recovered:

   a.   A MPD Citation for "Vincent Jackson" recovered from the bedroom closet shelf next to the firearms, along with multiple items of clothing.

   b.   A red Nike shoe box containing $1500 in U.S. Currency

   c.   (8) Blazer 9mm unspent cartridges (recovered from inside of the Taurus handgun)

   d.   (14) WGC 9mm brass cartridges (recovered from inside of the Glock 9mm handgun)

15

e.     31 "C" stamped .22 cal unspent cartridges (recovered from inside the Kel-Tec handgun)

f.     (72) Super X brand .22LR cartridges (recovered from inside a "Dunham's" plastic bag next to the fireamrs

g.     (8) firearms magazines (recovered from inside the "Dunham's" plastic bag

h.     Pistol holster, black in color

i.     State of Wisconsin bi-fold wallet (recovered from bottom dresser drawer west wall)

j.     State of Wisconsin vehicle title for JACKSON's gold Infiniti (recovered from wallet)

k.     State of Wisconsin driver's license (bearing the name of Victim 4) recovered in the bottom dresser drawer

l.     MPD citation for JACKSON recovered from bedroom closet next to firearms

m.     Black and grey backpack containing 40.44 grams of green plant based substance that tested positive for THC.

31.    On June 8, 2022, MPD Detective Brendan Dolan swore to an affidavit requesting the authorization of the **Target Cell Phone** which was obtained during JACKSON's arrest and on June 16, 2022, an attempt to download the phone was conducted. Due to the phone being locked and a passcode not provided by JACKSON, only the SIM data was able to be extracted. During that extraction, investigators were able to obtain the cellular telephone number assigned to the **Target Cell Phone**. That number was determined to be **414-202-7909** which is associated to the Service Provider, **T-MOBILE**.

## IDENTIFICATION OF FACEBOOK ACCOUNT

32.    On July 1, 2022, the Facebook ("FB") account believed to be used by JACKSON was identified as "**LilBill OffGalena**" with the Username: **lilbill.offgalena.71**, and **Account ID: 100029507075929**. A request for preservation of records for the account was submitted via the Facebook portal. The Account was publicly available and therefore any user w as able to view the content of the account. The profile picture was of a black male wearing a blue shirt with yellow writing. The black male in the profile was consistent with the same physical characteristics of JACKSON including face tattoos that are cvonsistent with the face tattoos documented in prior JACKSON booking photographs. This Facebook profile was also the Facebook profile identified by Victim 3 as the suspect that robbed her.

## TECHICAL INFORMATION

33.    Based on my training and experience, I am aware that individuals involved in criminal activity, including violent offenses with firearms, have also used websites and third-party applications, such as Facebook, to communicate regarding their illegal activity and flaunt illegal firearms.

34.    Meta Platforms,, Inc. owns and operates a free-access social networking website called Facebook that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

35.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical

17

address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

36. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their

18

Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

39. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

40. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

41. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or

19

content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

43. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

46. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

47. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

48. Social networking providers like Meta Platforms, Inc. typically retain additional information about their users' accounts, such as information about the length of service (including

20

start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta Platforms, Inc. typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta Platforms, Inc., can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses; investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access,

use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

50. Therefore, the computers of Meta Platforms, Inc. are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

51. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta Platforms, Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B1 and B2. Upon receipt of the information described in Section I of Attachment B1 and B2, government-authorized persons will review that information to locate the items described in Section II of Attachment B1 and B2.

22

## CONCLUSION

52.     Based on the foregoing, I request that the Court issue the proposed search warrant.

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta Platforms, Inc.. Because the warrant will be served on Meta Platforms, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant

23

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID **100029507075929** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

.

**ATTACHMENT B**

**Particular Things to be Seized**

I.     **Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including the full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers for user Account Name: "**LilBill OffGalena**" with the Username: **lilbill.offgalena.71**, and **Account ID: 100029507075929**.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **March 1, 2022 to June 1, 2022**;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

25

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **March 1, 2022 to June 1, 2022**;**,** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **March 1, 2022 to June 1, 2022**;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service used by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

26

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 10 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2119(1) (carjacking), 18 U.S.C. § 924(c) (possessing and/or brandishing a firearm during a crime of violence), and 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm) involving VINCENT JACKSON, including, for each user ID identified on Attachment A, information pertaining to the following matters:

> (a) The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between VINCENT JACKSON and others related to the relevant offense conduct of illegal use and possession of firearms and carjacking;

> (b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

> (c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

> (d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

> (e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of the sale of firearms and sale and use of controlled substances, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in

28

addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____
Date

_____
Signature